IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ROSEMARY MASON HAUSER, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No.: 1:17-cv-03844-JMC |
| MARK RICHARD POWELL, *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM**

The case is before me for all proceedings by the consent of the parties pursuant to 28 U.S.C. § 636(c). (ECF No. 7). Now pending before the Court are seven pretrial motions. (ECF Nos. 52, 53, 54, 60, 61, 62, 63). The parties have filed their respective oppositions. (ECF Nos. 55, 56, 57, 66). No hearing is needed. *See* Loc. R. 105.6 (D. Md. 2018).

For the reasons described herein:

1. Defendant GEICO's Motion in Limine to Exclude the Testimony of Dr. Adam Di Dio Regarding Plaintiff's Neurocognitive Testing and Results Contained Therein (ECF No. 52) is **DENIED**;

2. Defendant GEICO's Motion in Limine to Exclude the Testimony of Dr. Thomas Borzilleri (ECF No. 53) is **DENIED**;

3. Defendant GEICO's Motion in Limine to Exclude the Testimony of Tanja Hubacker (ECF No. 54) is **DENIED**;

4. Defendant Powell's Motion in Limine to Exclude the Testimony of Adam Di Dio (ECF No. 60) is **DENIED**;

5. Defendant Powell's Motion in Limine to Exclude the Testimony of Tanja Hubacker (ECF No. 61) is **DENIED**;

6. Plaintiff's Motion in Limine to Exclude Defendants' Experts David Buchholz, M.D. and Scott Beveridge, Ph.D. (ECF No. 62) is **DENIED** without prejudice, as to Scott Beveridge, Ph.D., and **DENIED as MOOT** as to David Buchholz, M.D.;

7. Plaintiff's Motion in Limine to Exclude Defendants' Expert Jack Spector, Ph.D. (ECF No. 63) is **GRANTED**.

## BACKGROUND

On March 15, 2016, Plaintiff Rosemary Hauser was a passenger in a motor vehicle travelling southbound on I-97 in Anne Arundel County, Maryland. (ECF No. 1 at 1). Jennifer Flake, the owner and operator of the vehicle, was insured by Hanover Insurance Group, Inc. ("Hanover"). (ECF No. 29 at 2). Defendant Mark Powell, operating a motor vehicle in the same location, struck Ms. Flake's vehicle and fled the scene. *Id.* at 2. At the time of the accident, Plaintiff maintained an automobile insurance policy through GEICO General Insurance Company ("GEICO"), containing uninsured/underinsured motorist coverage. *Id.*

Plaintiff filed suit against Defendant Powell. (ECF No. 1). GEICO moved to intervene as a party defendant on March 1, 2019, which this Court granted. (ECF No. 18 & 23). Hanover entered an appearance as an interested party on August 15, 2019. (ECF No. 25).

## LEGAL RULE

Because each these motions in limine seek to exclude expert witness testimony, the Court will first establish the overarching legal framework. Federal Rule of Evidence 104(a) charges the Court with deciding "preliminary question[s] about whether a witness is qualified . . . or evidence is admissible." Fed. R. Evid. 104(a). Where, as here, the preliminary questions relate to expert

witnesses, the Court must turn to Rule 702, which governs the admissibility of such testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 and the accompanying Advisory Committee Note embraces the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *Daubert* set forth a list of non-exhaustive factors by which courts may evaluate the reliability of an expert's reasoning or methodology. 509 U.S. at 593–94. These factors include: (1) whether a theory or technique "can be (and has been) tested"; (2) whether a theory or technique "has been subjected to peer review and publication"; (3) whether a particular scientific technique has a "known or potential rate of error"; (4) the "existence and maintenance of standards and controls"; and (5) whether a theory or technique has achieved "general acceptance" in the relevant scientific community. *Id.* These factors are "meant to be helpful, not definitive," and the Court must decide which factor or factors apply in each case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). Indeed, a faithful application of relevant factors ensures that "an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

The party offering expert testimony must establish its admissibility by a preponderance of the evidence. *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d 549, 553 (D. Md.

3

2011). The Court, in turn serves a "gatekeeping role," to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In all cases, "the court 'should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate.'" *Young v. Swiney*, 23 F. Supp. 3d 596, 611 (D. Md. 2014 (citation omitted)). The Court, even as gatekeeper of reliable evidence, is not to "supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 596).

Under this framework, a duly qualified expert witness may testify to technical, scientific, or other specialized knowledge if the testimony would assist the trier of fact in understanding the evidence or determining a fact in issue. *United States v. Young*, 916 F.3d 368, 379 (4th Cir. 2019).

## DEFENDANTS' MOTIONS IN LIMINE TO EXCLUDE THE TESTIMONY OF DR. ADAM DI DIO

Plaintiff designated Dr. Adam Di Dio, M.D., her treating neurologist, as an expert "neurologist specializing in treatment of brain trauma." (ECF No. 60-1 at 5). Defendants GEICO and Powell move to exclude Dr. Di Dio's testimony concerning Plaintiff's neurocognitive testing and results. (ECF Nos. 52-1 at 1; 60 at 1). Plaintiff opposes both motions. (ECF Nos. 57; 70).

**A.     Parties' Contentions**

Defendants argue that Dr. Di Dio's testimony should be excluded for two principal reasons.[1] First, Defendants attack Dr. Di Dio's methodology and suggest Dr. Di Dio did not

---

[1] In arguing that Dr. Di Dio's testimony should be excluded, Defendants make several references to defense expert Dr. Jack Spector. However, given that Defendants withdraw Dr. Spector as an expert witness, consent to Plaintiff's motion in limine (ECF No. 63), and request the Court "preclude the parties and any experts from relying on or referencing Dr. Spector and/or any part of Dr. Spector's opinions," (ECF No. 66 at 2), the Court will not consider arguments made in reliance on Dr. Spector's opinions.

4

conduct a complete evaluation of Plaintiff's neurocognitive level of functioning.  (ECF Nos. 52-1 at 4; ECF No. 60 at 3).  Defendants distinguish the computer-administered CNS Vital Signs test that Dr. Di Dio did administered and a "physically-administered neuropsychological test[]," or "neuro-psych evaluation."  (ECF Nos. 52-1 at 5; 60 at 3).  The CNS Vital Signs test, Defendants contend, is an unreliable testing method because it is (1) "shorter and less comprehensive than a traditional neuropsychological evaluation"; "computerized and not administered by any medical professionals"; (3) and "not accepted as a 'diagnostic tool' in the medical community, yet Dr. Di Dio used it to diagnose Plaintiff."  (ECF No. 60 at 3–4; *see also* ECF No. 52-1 at 4–6).

Second, Defendants challenge the validity and reliability of Dr. Di Dio's conclusions. (ECF Nos. 52-1 at 6–9; 60 at 3–4).  Specifically, the "CNS Vital Signs testing does not contain the necessary safeguards to evaluate test-taking effort, exaggeration, or malingering to ensure the validity of its results."  (ECF No. 52-1 at 6).  Despite the test's validity indicators, Defendants suggest the fact that "it is easy to correct an invalid score" makes it "clear that the 'validity' testing looks to identify a test-taker's comprehension or technological challenges, rather than for any malingering or effort."  *Id.* at 7.

Plaintiff counters that Dr. Di Dio's testimony is reliable, valid, and should be permitted at trial.  Importantly, Plaintiff argues that Dr. Di Dio is her treating physician and Dr. Di Dio's CNS Vital Signs testing is just a tool used in his entire clinical evaluation.  (ECF No. 57 at 1; 4).  That the CNS Vital Signs testing is not a diagnostic tool itself is of no moment; moreover, that the test is not a "complete evaluation" of Plaintiff does not mean it must be excluded.  *Id.* at 4–5.  Instead, "the alleged incompleteness of the tests conducted as part of, or in conjunction with, a physician's treatment" goes to the weight, not admissibility, of the treating physician's testimony.  *Id.* at 5. Still, Plaintiff maintains that "the CNS Vital Signs test is an adequate substitute for

5

neuropsychological exam when used in conjunction with all other aspects of [Dr. Di Dio's] examination and evaluation." *Id.* at 7. As for the validity of the CNS Vital Signs test, Plaintiff stresses that the test *does* have validity indicators. (ECF No. 57 at 8). The validity indicators monitor a test taker's comprehension, malingering and effort, as opposed to comprehension alone. *Id.* (quoting CNS Vital Signs, *Clinical Practice*, https://www.cnsvs.com/ClinicalPractice.html).

**B.    Analysis**

Dr. Di Dio opined in his Final Report that Plaintiff's "cognitive profile demonstrates the hallmark findings of a *moderately severe, Diffuse Axonal-type Injury*, seen in concussion/mild traumatic brain injury (mTBI)." (ECF No. 60-2 at 3 (Emphasis in original)). "Formal Neurocognive testing," Dr. Di Dio continued, "has revealed that [Plaintiff's] overall cognitive performance is severely impaired when compared to the general population." *Id.*

At deposition, Dr. Di Dio himself provided the leading basis for Defendant's argument in the instant motion—that the CNS Vital Signs test is not *by itself* a diagnostic tool. However, Defendants' arguments either ignore or refuse to acknowledge the remainder of Dr. Di Dio's explanation that the test *in addition to other data*, such as that reviewed by a treating physician, makes the test a sufficiently reliable foundation upon which to base an opinion. Dr. Di Dio explained:

> [Y]ou can't use the CNS Vital Signs test by itself as a diagnostic tool. But when it's correlated clinically, especially with a person applying the test and who's examined the patient and has other data to utilize, . . . I don't believe that a neuropsychological examination is going to be any more helpful."
>
> * * *
>
> [I]f you're comparing neuro-psych[ological evaluation] just to the CNS [Vital Signs test] battery, sure, the neuro-psych[ological evaluation] is more comprehensive, but that's only when it's not being . . . applied by the physician that's treating [the patient].

(ECF No. 57-3 at 7). The CNS Vital Signs test "becomes diagnostic when it is applied clinically by the appropriately trained individual." *Id.* at 13. Nevertheless, Dr. Di Dio further explained that his opinions are not purely the result of the CNS Vital Signs testing. Instead, Dr. Di Dio "correlate[ed]" the test results with "the questionnaires . . . , the history [he] already obtained, the examination that [he] already performed, the imaging that's already been obtained and the follow-up that's been obtained." *Id.* For these reasons, the Court concludes that Dr. Di Dio's methodology is reasonably sound survive Rule 702 and *Daubert* scrutiny.

The Court likewise finds Defendants' corollary attack on the CNS Vital Signs test—that it is unreliable and invalid—unpersuasive. Contrary to Defendants' assertion that the test does not have adequate safeguards to ensure its validity, the test *does* have validity indicators, which utilize a "sophisticated algorithm . . . to determine if the scores are valid." (ECF No. 57-3 at 6). When a score is invalid, "it is indicated as a 'no' in the validity indicator column." *Id.* Dr. Di Dio noted that "the test has been shown to be . . . [of] comparable sensitivity to malingering and embellishment as conventional neuropsychological tests." *Id.* Additionally, whereas Defendants perceive the computerized administration of the CNS Vital Signs test in a negative light, Dr. Di Dio finds it more objective. He testified that "the nice thing about" the test is that "because it's not administered by a human, you've got a lot more . . . stimulus sensitivity and no bias . . . and nobody to give you clues . . . . [I]t's unforgiving, really." *Id.*

Defendants, of course, will be afforded an opportunity to present contrary evidence and engage Dr. Di Dio on cross-examination. At that time, Defendants are free to explore each basis of the instant motion in limine; indeed, Dr. Di Dio's answers may well undermine the overall weight of his opinion. However, the value of Dr. Di Dio's opinion is ultimately a question for the jury. *See e.g.*, *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006) ("[E]xpert testimony

is subject to testing by vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof.").

Plaintiff has established by a preponderance of the evidence that Dr. Di Dio's opinions satisfy Federal Rule of Evidence 702 and the factors set out by the Supreme Court in *Daubert*. Therefore, Defendants' Motions in Limine to Exclude the Testimony of Dr. Adam Di Dio (ECF Nos. 52; 60) are hereby DENIED.

<u>DEFENDANT GEICO'S MOTION IN LIMINE TO EXCLUDE
THE TESTIMONY OF DR. THOMAS BORZILLERI</u>

Plaintiff designated Dr. Thomas Borzilleri, Ph.D., as a economist and damages expert to "calculate the present value of [Plaintiff's] loss of earning capacity" as a result of the accident. (ECF No. 60-1 at 3). Defendant GEICO moves to exclude Dr. Borzilleri's testimony regarding the present value of Plaintiff's loss of earning capacity. (ECF Nos. 53-1 at 1). Plaintiff opposes the motion. (ECF No. 56). Dr. Borzilleri holds multiple degrees—B.S., M.A., and Ph.D.—all in the field of Economics. (ECF No. 56-1 at 1). Indeed, Dr. Borzilleri has more than forty-five years of experience as an Economic Consultant. (ECF Nos. 53-2 at 1; 56-1 at 1). Furthermore, Dr. Borzilleri "has offered expert testimony in hundreds of trials and depositions, and has qualified as an expert in court over [seventy] times between 2014 and 2018 alone." (ECF No. 56 at 5).

**A.     Parties' Contentions**

GEICO argues that Dr. Borzilleri's testimony should be excluded for a series of reasons. First, Dr. Borzilleri's testimony is inadmissible because he relied on Ms. Hubacker's "inadmissible opinions," in reaching his conclusions.[2] (ECF No. 53-1 at 5). Second, GEICO contends that Dr. Borzilleri's earnings loss calculation is flawed because "despite Plaintiff's accident having

---

[2] In light of this Court's decision to deny Defendants' motion vis-à-vis Ms. Hubacker, explained in more detail *infra*, this argument carries little weight.

8

occurred on March 15, 2016," the calculation "imposes a loss start date of January 1, 2018." *Id.* Additionally, Dr. Borzilleri omitted Plaintiff's 2016 and 2017 earnings when calculating Plaintiff's "average earnings to determine her earning capacity." *Id.* at 6. Third, GEICO avers that Dr. Borzilleri's opinions fail to account for Plaintiff's post-accident work experience and earnings. *Id.* Finally, GEICO argues that, in rendering his opinions, Dr. Borzilleri fails to account for Plaintiff's pre-accident employment history and challenges. *Id.* at 7.

Plaintiff responds that GEICO's arguments are either unsupported, or go to the weight, not admissibility, of Dr. Borzilleri's testimony. Specifically, Plaintiff suggest that Dr. Borzilleri's means of calculating Plaintiff's pre- and post-accident earning capacity is reliable. (ECF No. 56 at 3). On this point, Dr. Borzilleri determined the amount of Plaintiff's pre-accident earnings from 2012 to 2015 to be $529,594. *Id.* Then, Dr. Borzilleri calculated Plaintiff's post-accident earnings from 2016 to 2019 to be $50,974. *Id.* at 3–4. Plaintiff argues that Dr. Borzilleri *did* account for Plaintiff's 2019 earnings in the amount of approximately $80,000 as evidenced by the "Expected Earnings Given Injury" chart appended to Dr. Borzilleri's Updated and Revised Report. (ECF No. 53-3 at 17). Finally, Plaintiff asserts that Dr. Borzilleri considered Plaintiff's pre-accident work history and employment challenged by averaging four years of Plaintiff's income, which included "good" years and "bad" years—i.e., years in which Plaintiff earned income in excess of one million dollars and years in which she earned roughly a quarter of a million dollars. (ECF No. 56 at 5).

**B.     Analysis**

The crux of Defendant's argument to exclude Dr. Borzilleri's testimony revolves around the notion that Dr. Borzilleri's calculations, and therefore opinions, are flawed in that they (1) impose a loss start date two years after the underlying accident; (2) rely on select years of Plaintiff's pre-accident income; (3) do not assign value to certain years of Plaintiff's post-accident

income; (4) does not account for periods of unemployment in Plaintiff's work history; and (5) fails to set Plaintiff's retirement date at a set age.

It bears repeating that the Court's role is to "focus on the expert's principles and methodology, and not on the conclusions that they generate." *Young*, 23 F. Supp. 3d at 611. "'[Q]uestions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility' of the witness' assessment, 'not its admissibility.'" *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation omitted).

Dr. Borzilleri's methodology is set out in his Updated and Revised Report and deposition testimony. (ECF Nos. 53-3; 56-2). Averaging Plaintiff's income as reflected in her federal tax returns for the years 2012–2015, Dr. Borzilleri determined Plaintiff's pre-accident earning capacity to be $529,594 in 2016 dollars. (ECF No. 53-3 at 3). Dr. Borzilleri considered Plaintiff's post-accident income from 2016–2018, but "provide[d] a conservative estimate of losses [by] assum[ing] a loss start date of January 1, 2018." *Id.* To calculate potential loss mitigation, Dr. Borzilleri relied on Ms. Hubacker's report. *Id.* From there, Dr. Borzilleri determined the average annual earned income of a tax preparer to be $39,953.

Dr. Borzilleri explained that "economic losses may be computed in so-called 'real' or after-inflation terms or in terms of nominal amounts, dollar losses without adjusting for purchasing power." (ECF No. 53-3 at 3). While "[e]ither calculation produces approximately the same answer[,]" he relies on information provided by the Congressional Budget Office to employ "the nominal approach in which nominal rates of earnings growth and market interest rates are used." *Id.* at 3–4. Dr. Borzilleri calculates a range of losses "for every age when employment may cease, highlighting . . . typical retirement ages." *Id.* at 4; *see also* (ECF No. 56-2 at 6). Finally, Dr.

Borzilleri calculates "statistical worklife after an adjustment for the probability of unemployment" and "a benchmark estimate for fringe benefits." (ECF No. 53-3 at 4).

It follows that Dr. Borzilleri's opinions pass evidentiary muster. Absent bald assertions that Dr. Borzilleri failed to "follow[] any methodology," Defendant's arguments falls short of showing that Dr. Borziller's opinions are not "the product of reliable principles and methods." *See* Fed. R. Evid. 702(c). Dr. Borzilleri has explained how his calculations utilize various work years, and provide estimated earnings for various work like horizons. Defendant's criticisms of Dr. Borzilleri's testimony goes mainly to how he emphasizes or incorporates certain data points. While that is valid fodder for cross examination, it is not grounds for exclusion.

Plaintiff has established by a preponderance of the evidence that Dr. Borzilleri's opinions satisfy Federal Rule of Evidence 702 and the factors set out by the Supreme Court in *Daubert*. Therefore, Defendant's Motion in Limine to Exclude the Testimony of Dr. Thomas Borzilleri (ECF No. 53) is hereby DENIED.

## DEFENDANTS' MOTIONS IN LIMINE TO EXCLUDE THE TESTIMONY OF TANJA HUBACKER

Plaintiff designated Tanja Hubacker, MA, CRC, NCC, LCPC, as an expert in vocational rehabilitation. (ECF No. 60-1 at 2). Defendants GEICO and Powell move to exclude Ms. Hubacker's testimony regarding Plaintiff's employability and wage-earning capacities. (ECF Nos. 54-1 at 1–3; 61 at 1). Plaintiff opposes the motions. (ECF Nos. 55; 69). Ms. Hubacker has approximately twenty years of experience in the field of vocational rehabilitation. (ECF No. 55 at 1). Ms. Hubacker earned a Master of Arts in Rehabilitation Counseling from George Washington University. *Id.* In this field, she "provide[s] vocational evaluations for workers compensation, long term disability, short term disability, disability retirement, and divorce cases." *Id.*

**A.     Parties' Contentions**

Broadly, Defendants argue that Ms. Hubacker's opinions are "not the product of the application of reliable principles and methods" as required under Rule 702. (ECF Nos. 54-1 at 4; 61 at 2). In support, Defendants attack Ms. Hubacker's opinions on three grounds. First, Defendants assert that Ms. Hubacker relied on an incomplete evaluation of Plaintiff—Dr. Di Dio's neurocognitive testing—in reaching her conclusions. (ECF Nos. 54-1 at 5). The results of Dr. Di Dio's testing, upon which Ms. Hubacker relied in reaching her opinion, is not the "comprehensive neurological testing required to diagnose an individual," and "fails to employ specific measures designed to evaluate test-taking effort, exaggeration, and malingering."[3] *Id.* Second, Defendants argue that Ms. Hubacker "fail[ed] to follow any established scientific method" in reaching her opinions. *Id.* at 7. Defendant's point to the fact that Ms. Hubacker chose not to use the RAPEL methodology[4]—the "most widely used methodology for the evaluation of earning capacity and generally accepted within the 'relevant scientific community'"—and, in describing her methodology, "does not reference the use of *any* peer-reviewed models or widely accepted methodology." (ECF Nos. 54-1 at 8; 61 at 2) (emphasis in original). Third, Defendants assert that Ms. Hubacker "chooses not to recognize Plaintiff's income-earning history and current potential[,] recent earnings," other "contextual factors (i.e., Plaintiff's family migraine and headache history, socioeconomic status, older age, and the impacts of generational patterns) . . . [and] two other available evaluations beyond that of Dr. [Di] Dio's." (ECF Nos. 54-1 at 3–12; 61 at 2–4 (emphasis

---

[3] In light of this Court's decision to deny Defendants' motion vis-à-vis Dr. Di Dio, explained in more detail *supra*, this argument also carries little weight.

[4] As explained by Plaintiff, RAPEL "is a mnemonic that includes relevant topics for damages in personal injury litigation: R=Rehabilitation, A=Access (variety of jobs for which the individual is qualified), P=Placeability (special difficulty this sort of individual might have in finding suitable job in this community), E=Earning capacity (educational and occupational potential; the ability to learn and train), and L=Labor force participation (work life expectancy)." (ECF No. 55 at 6 (quoting *Morgan v. Jacques*, 2010 WL 11537864, at *3 n.1 (D. Vt. Oct. 5, 2010)).

12

omitted)). As such, Ms. Hubacker's opinions are "not based on sufficient facts and data," as required by Rule 702(b). (ECF Nos. 54-1 at 11; 61 at 4).

Plaintiff responds that Ms. Hubacker's "methodology . . . is well-established as reliable and generally accepted in the field of vocational rehabilitation." (ECF No. 55 at 3). Specifically, Plaintiff contends that courts within this Circuit "have held that methodology similar to that used by Ms. Hubacker is reliable." *Id.* at 7. *See Rozinsky v. Assurance Company of America*, 2017 WL 3116682 (D. Md. 2017); *Gott v. Raymond Corp.*, 2008 WL 11452486 (N.D.W.Va. 2008); *Walker v. DDR Corp.*, 2019 WL 3409724 (D. S.C. 2019). Here, Ms. Hubacker met with Plaintiff in person, conducted a follow-up phone interview, reviewed Plaintiff's answers to interrogatories and deposition, reviewed Plaintiff's medical record, resume and tax returns both before and after the injury, and interviewed Plaintiff's former employer. (ECF No. 55 at 8). Ms. Hubacker conducted labor market research using the Dictionary of Occupational Titles, Occupational Information Network, Bureau of Labor Statistics, among other sources. *Id.* Labor market research and inquiry, Plaintiff contends, is an acceptable model by which to determine an individual's earning capacity. *Id.* at 8–9. Moreover, Plaintiff argues that Ms. Hubacker's report and testimony contain the hallmarks of a "transferrable skills analysis" in substance, even if she did not use that term. *Id.* at 9.

To Defendants' second argument, that Ms. Hubacker opinions are unreliable because she relied on Dr. Di Dio's medical records as opposed to Defendants' experts, Plaintiff notes that Dr. Di Dio is Plaintiff's treating neurologist and Dr. Di Dio's neurological assessment was part of the medical record. (ECF No. 55 at 10). As such, it is customary for a vocational expert to review in rendering her opinion. *Id.* Defendants' expert reports are not medical records necessitating her review. *Id.* at 11. Finally, Plaintiff argues that Ms. Hubacker's choice to disregard Plaintiff's 2019

contract work (and income arising therefrom) was within her discretion and goes to the weight of Ms. Hubacker's testimony, not the admissibility. (ECF No. 55 at 11–12). Accordingly, Plaintiff suggests this is "classic cross-examination material, not grounds to exclude expert testimony." *Id.* at 12.

**B.    Analysis**

The Court remains unpersuaded that Defendants' perceived deficiencies in Ms. Hubacker's basis of knowledge and methodology in reaching her opinions renders the opinions wholly unreliable under *Daubert* or unhelpful to the jury under Rule 702. In forming her opinions, Ms. Hubacker reviewed Plaintiff's resume, federal income tax returns, answers to interrogatories, and medical notes and reports. (ECF No. 55-1 at 1). Ms. Hubacker also interviewed Ms. Hauser and Ms. Hauser's former employer. *Id.* Finally, Ms. Hubacker conducted labor market research "using employer websites, posted job leads and Department of Labor and Bureau of Labor Statistics reports." *Id.* at 1–2.

Simply because Ms. Hubacker did not employ the RAPEL method does not mean that her opinion is unreliable. The Court finds that, in substance, Ms. Hubacker's methodology is the result of reliable principles and methods. As Plaintiff indicates, *Rozinsky*, 2017 WL 3116682, is instructive in this regard. There, this Court permitted a vocational assessment expert to testify after examining comparable documents to those which Ms. Hubacker reviewed, conducting a "'transferrable skills analysis'[5] and 'labor market research;' and 'review[ing] Bureau of Labor

---

[5] As explained in *Rozinsky*, a

> [t]ransferable skills analysis is where you take the job history that's been described by the client and you match that history up with Department of Labor [Dictionary of Occupational Titles ("DOT")] numbers. . . . Those DOT numbers provide you information regarding the skill level of the job. The reasoning, math and language skills for the job. The physical demands of the job and a description of the job itself. Once you have that information, you then factor in any medical restrictions for work that you've been provided, thus leaving any alternative occupations that the individual can now perform using the same skills, but within a more physically suitable occupation.

Statistics'" information.  *Rozinsky*, 2017 WL 3116682 at *3.  Indeed, beyond this Court, the United States Court of Appeals for the Fourth Circuit has found that a transferrable skills analysis assessment is reliable.  *See Mullins v. AT & T Corp.*, 424 Fed. Appx. 217, 224 (4th Cir. 2011).

The Court finds that Ms. Hubacker's labor market research functionally applied a "transferrable skills analysis," even if her report did not expressly style it in those terms. Additionally, following *Rozinsky*, the Court believes that Ms. Hubacker reviewed ample facts and data upon which to form an expert opinion.  (ECF No. 55-1 at 1–2).  Informed by the Occupational Information Network and the Dictionary of Occupational Titles, Ms. Hubacker remarked in her report that as a Chief Information Officer, Plaintiff was required

> to perform complex judgment and decision making, perform complex problem solving and critical thinking, work in coordination with others, manage personnel resources, manage financial resources, negotiate, persuade, perform systems analysis and systems evaluation, perform deductive and inductive reasoning, have fluency of ideas and originality, as well as the ability to perform information ordering, category flexibility, memorization, and selective attention.

*Id.* at 6–7.  Informed by all of the information presented to Ms. Hubacker, she explained that Plaintiff's post-accident cognitive functioning precluded Plaintiff from "preform[ing] the high level of detailed and complex reasoning and attention required for her past work."  *Id.* at 7.  Instead, Plaintiff's "markedly low abilities in memory and executive function . . . preclude the ability to preform simple, routine, unskilled competitive employment."  *Id.*  Put another way, Ms. Hubacker assessed the skills necessary to function in Plaintiff's pre-accident line of work and determined that Plaintiff's post-accident state precluded similar employment.  This satisfactorily aligns with a transferrable skills analysis; accordingly, the Court concludes that Ms. Hubacker's testimony is based on reliable principles and methods and supplied with sufficient facts and data.

---

2017 WL 3116682 at *3.

As with Dr. Di Dio and Dr. Borzilleri, Ms. Hubacker will, of course, be subject to cross examination at trial. The Court "is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Production Liab. Litig. (No. II)*, 892 F.3d 624, 631 (4th Cir. 2018) (citation and quotation marks omitted). At the appropriate time, Defendants may challenge Ms. Hubacker's reliance on Dr. Di Dio's opinions, inquire into Ms. Hubacker's perceived lack of methodology, and question her decision not to incorporate certain portions of Plaintiff's earnings and income in reaching her opinions. However, this Court will not exclude Ms. Hubacker's opinions on those grounds.

Plaintiff has established by a preponderance of the evidence that Ms. Hubacker's opinions satisfy Federal Rule of Evidence 702 and the factors set out by the Supreme Court in *Daubert*. Therefore, Defendants' Motions in Limine to Exclude the Testimony of Tanja Hubacker (ECF Nos. 54; 61) are hereby DENIED.

### PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE DEFENDANTS' EXPERTS SCOTT BEVERIDGE PH.D. AND DAVID BUCHHOLZ, M.D.[6]

Plaintiff Hauser moves to exclude the testimony of Defendant's expert, Dr. Scott Beveridge.[7] (ECF No. 62-1 at 1). Defendants Powell and GEICO, and Interested Party Hanover, oppose the motion. (ECF No. 67-1).

The parties filed, and this Court entered, an Agreed Order to facilitate a Rule 35 vocational evaluation of Plaintiff by Dr. Beveridge. (ECF Nos. 38-2; 40). Pursuant to the Order, the Court

---

[6] In ECF No. 62 as originally filed, Plaintiff moved to exclude two of Defendant's experts: Scott Beveridge, Ph.D. and David Buchholz, M.D. (ECF No. 62-1 at 1). However, Plaintiff withdrew her motion as to Dr. Buchholtz. (ECF No. 68). As such, the Court will limit consideration of ECF No. 62 as it pertains to Dr. Beveridge.

[7] The Court "may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1).

authorized Dr. Beveridge to conduct the following testing: "Word Reading, Sentence Comprehension, Math Computation, and Reading Composite." (ECF No. 40 at 1). Further, the Court ordered that Dr. Beveridge his report to Plaintiff's counsel within seven days of the examination (January 17, 2020), and "[w]ith the report . . . provide Plaintiff's counsel with copies of all notes, tests, test results, scoring sheets and any other documentation related to his evaluation." *Id.*

### A.   Parties' Contentions

Plaintiff argues that Dr. Beveridge failed to provide "any notes, tests, test results, scoring sheets, raw data or any documentation pertaining to the examination of Plaintiff." (ECF No. 62-1 at 2). Additionally, Plaintiff contends that Dr. Beveridge was served with a subpoena concerning production information relevant to financial bias, yet Dr. Beveridge failed to object, and subsequently comply, with the same. *Id.* For these reasons, Plaintiff seeks to exclude Dr. Beveridge's testimony at trial. *Id.* at 3.

Defendants respond that Plaintiff's discovery dispute over Dr. Beveridge's records is not a justification to exclude the expert's testimony and would be more appropriately addressed in discovery. (ECF No. 67-1 at 1; 3). Defendants concede that Dr. Beveridge has not produced documentation related to Plaintiff's examination, but "are hopeful this issue will be resolved." *Id.* at 3. With regard to Dr. Beveridge's financial records, Defendants seek to gather and produce responsive documents pursuant to a confidentiality agreement. *Id.*

### B.   Analysis

Under Rule 37, the Court is afforded a broad range of sanctions where a party fails to obey a court order. *See* Fed. R. Civ. P. 37(b)(2)(A). Specifically, if a party "fails to obey an order to provide or permit discovery," including an order under Rule 35, the court may issue further orders

"prohibiting the disobedient party from . . . introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii).  It is clear that Dr. Beveridge has failed to obey this Court's January 8, 2021 Order by withholding from Plaintiff's counsel "copies of all notes, tests, test results, scoring sheets and any other documentation related to his evaluation."  Over a year has passed since this Court ordered Dr. Beveridge produce the information.  While it would be within the Court's purview to exclude Dr. Beveridge's testimony for failure to obey a Court order, the Court is willing to give counsel for Defendants fourteen days from the issuance of this order to produce the aforementioned documents to Plaintiff's counsel.  If such a production does not occur, Plaintiff shall file a line advising the Court, and move to renew the instant motion in limine.

Accordingly, Plaintiff's Motion in Limine to Exclude Defendant's Expert Scott Beveridge, Ph.D. (ECF No. 62) is hereby DENIED without prejudice.

## PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE DEFENDANT'S EXPERT JACK SPECTOR PH.D.

Plaintiff Hauser moves to exclude the testimony of Defendant's expert, Jack Spector, Ph.D. (ECF No. 63-1 at 1).  Defendants Powell and GEICO, and Interested Party Hanover, no longer intend to call at trial, and accordingly withdraw, Dr. Spector as an expert witness. (ECF No. 66 at 1).  Therefore, Plaintiff's Motion in Limine to Exclude Defendant's Expert Jack Spector, Ph.D. and preclude any expert from relying on or referencing any part of Dr. Spector's opinions (ECF No. 63) is hereby GRANTED.

## CONCLUSION

For the reasons described herein:

1. Defendant GEICO's Motion in Limine to Exclude the Testimony of Dr. Adam Di Dio Re Plaintiff's Neurocognitive Testing and Results Contained Therein (ECF No. 52) is **DENIED**;

2. Defendant GEICO's Motion in Limine to Exclude the Testimony of Dr. Thomas Borzilleri (ECF No. 53) is **DENIED**;

3. Defendant GEICO's Motion in Limine to Exclude the Testimony of Tanja Hubacker (ECF No. 54) is **DENIED**;

4. Defendant Powell's Motion in Limine to Exclude the Testimony of Adam Di Dio (ECF No. 60) is **DENIED**;

5. Defendant Powell's Motion in Limine to Exclude the Testimony of Tanja Hubacker (ECF No. 61) is **DENIED**;

6. Plaintiff's Motion in Limine to Exclude Defendants' Experts David Buchholz, M.D. AND Scott Beveridge, Ph.D. (ECF No. 62) is **DENIED** without prejudice, as to Scott Beveridge, Ph.D. and **DENIED as MOOT** as to David Buchholz, M.D.;

7. Plaintiff's Motion in Limine to Exclude Defendants' Expert Jack Spector, Ph.D. (ECF No. 63) is **GRANTED**.

An implementation Order shall issue.

Date: February 5, 2021                                /s/
                                                     J. Mark Coulson
                                                     United States Magistrate Judge